## Commonwealth v. First Pennsylvania Banking and Trust Company

*David Stahl*, Attorney General, and *Mark Yaskin*, Deputy Attorney General, for Commonwealth.

*Thomas S. Weary* and *Saul, Ewing, Remick & Saul*, for defendant.

KREIDER, J., July 23, 1962.—This is an appeal from the decision of the Board of Finance and Revenue refusing to vacate the order of the Pennsylvania Department of State which had denied appellant's petition for resettlement of domestic excise tax in the amount of $7,700 imposed under the Excise Tax Act of July 25, 1953, P. L. 564, 72 PS §1827.2 et seq. The parties waived a jury trial pursuant to the Act of April 22, 1874, P. L. 109, 12 PS §688, and entered into a stipulation of facts.

Defendant in its appeal to this court specified its objections as follows:

(a) The board's action in refusing to vacate the order of the Department of State and in refusing to allow appellant a credit for excise tax purposes for the full par value of all the shares of stock of The First National Bank of Philadelphia outstanding at the time of its merger with The Pennsylvania Company for Banking and Trusts (or, in the alternative, to the extent of the par value of the stock of The First National Bank of Philadelphia authorized prior to the passage of the Bonus Act of May 1, 1868, P. L. 108) was contrary to the provisions of the Excise Tax Act of 1953,

P. L. 564, with particular references to sections 2 and 3 of that act.

(b) The board's action resulted in a violation of section 5219 of the Revised Statutes of the United States, 12 U. S. C. A. §548.

(c) The board's action was arbitrary and lacking in uniformity and therefore was invalid.

From the stipulation of the parties we find the following

*Facts*

1. On June 27, 1955, The Pennsylvania Company for Banking and Trusts (a bank and trust company organized and existing under the laws of the Commonwealth of Pennsylvania) and The First National Bank of Philadelphia (a foreign corporation,[1] being a national banking association organized in 1863 and existing under the laws of the United States) by actions of their respective boards of directors agreed to a joint plan of merger. This action was subsequently approved by the stockholders of both institutions, by the Department of Banking of the Commonwealth and on September 30, 1955, by the Pennsylvania Department of State.

2. Under this plan of merger, the two institutions merged their rights, privileges, franchises and properties as authorized by article XIV of the Banking Code of May 15, 1933, P. L. 624, as amended. Pursuant to the plan, The Pennsylvania Company for Banking and Trusts was designated as the surviving institution and its name was changed to The First Pennsylvania Banking and Trust Company. Also, pursuant to the plan, the authorized capital of the surviving institution was

---

[1] " 'Foreign Corporation' means any corporation . . . chartered . . . by . . . the laws of any other state or of the United States or of any foreign country, which has been issued a certificate of authority by the Department of State to do business within this Commonwealth . . .": Act of July 25, 1953, P. L. 560, sec. 1, 72 PS §1861.

increased from $15,000,000 (divided into 1,500,000 shares of a par value of $10 per share) to $20,000,000 (divided into 2,000,000 shares of a par value of $10 per share).

3. Prior to the merger, The First National Bank of Philadelphia had authorized and outstanding capital stock in the total amount of $5,000,000 (divided into 500,000 shares of a par value of $10 per share). Capital stock in this amount had been outstanding since July, 1949, when a 25 percent stock dividend was issued by The First National Bank of Philadelphia. Prior to that time and subsequent to May 1, 1930, its authorized and outstanding capital stock had aggregated $4,000,000. At the time of the passage of the first Pennsylvania Bonus Act in 1868, the par value of the authorized and outstanding stock of The First National Bank of Philadelphia was $1,000,000.

4. The First National Bank of Philadelphia was chartered in 1863, and since that date has continuously transacted all its business solely within the Commonwealth, with offices in the City of Philadelphia.

5. Under the plan of merger the holders of the shares of capital stock of The Pennsylvania Company for Banking and Trusts retained their shares; and the holders of shares of the capital stock of The First National Bank of Philadelphia exchanged their shares for an equal number of $10 par shares of The First Pennsylvania Banking and Trust Company capital stock.

6. Although it had outstanding capital stock in the amount of only $15,000,000 at the time of the merger, The Pennsylvania Company for Banking and Trusts had actually paid domestic bonus under the Act of April 20, 1927, P. L. 322, and prior acts on a stated capital of $16,150,000 (i.e., $1,150,000 more than the amount of its outstanding capital stock at the time of the merger).

7. At the time the articles of merger were approved by the Department of State, no report of actual increase of capital stock was filed with the Secretary of the Commonwealth for the reason that neither of the banks believed that the merger involved an actual increase of capital stock inasmuch as the same aggregate amount of capital stock was authorized and outstanding after the merger as the combined authorized and outstanding capital stock of the two banks immediately prior to the merger.

8. Thereafter, on December 5, 1955, the Department of State notified appellant that the office of the attorney general had ruled that "the surviving state banking institution must pay excise tax on the aggregate increase of authorized capital on which no bonus or excise tax has been paid, including the aggregate amount of capital of the component national bank on which no bonus, or excise tax was theretofore payable." The Department demanded payment of the excise tax in the amount of $7,700 (i.e., at the rate of one-fifth of one percentum upon $3,850,000) and requested that a report be filed by The First Pennsylvania Banking and Trust Company showing an actual increase in capital stock.

9. On or about February 16, 1956, appellant complied with this demand by filing "under protest" a report in which an actual increase of capital stock in the amount of $5,000,000 was set forth resulting in an excise tax of $7,700.

### The Principal Question Involved

Where a bank chartered by the Commonwealth of Pennsylvania merges with a national bank and the State bank is the surviving corporation, may the Commonwealth impose a domestic excise tax upon the *subsequent increase* of the authorized capital of the surviving State bank, such increase being equivalent to the exact value of the capital of the component na-

tional bank on which no bonus or excise tax was theretofore payable by reason of the national bank's previous exemption from the tax in question?

The parties agree that this is a case of first impression and that the problem is one of statutory construction. The Commonwealth contends that this newly created authorized capital stock of the surviving State institution is fully taxable under section 2(f) of the Excise Tax Act of 1953, supra.

Defendant, on the other hand, contends that none of the value of the newly authorized stock is taxable under section 2(f) because it represents the exact value of the capital of the national bank which value was exempt from the payment of the domestic bonus or excise tax *before* the merger and, therefore, should be exempt from the tax *after* the merger.

### The Statute

The Pennsylvania Domestic Excise Tax Act[2] of 1953, supra, P. L. 564, 72 PS §1827, provides:

---

[2] "The Domestic Excise Tax which was adopted in 1953 superseded the Domestic Bonus levy which was imposed for many years as a consideration for the right of a Pennsylvania corporation to issue capital stock. The change in title of this levy was occasioned by the Federal Income Tax ruling that payments of bonus were not entitled to deduction as a tax paid, but were rather to be capitalized as an organization expense. The 1953 statute made several changes in method of imposition in addition to affecting a change of name. . . .

"As its name implies, the Domestic Excise Tax applies only to Pennsylvania corporations, and is a tax imposed upon the privilege of exercising corporate franchises or other powers.

"It is not a recurring annual tax; rather it is imposed only upon incorporation of the enterprise, or in event of subsequent amendment of the corporate charter to permit increased capitalization. . . .

"As to corporations in existence prior to 1953, the excise tax is collected only upon increases of capital stock made subsequent to enactment and for which the Domestic Bonus had not previously been collected": Rosenbluth, Pennsylvania Business Taxes (1959) p. 10.

"Section 2. Imposition of Tax.—An excise tax of one fifth of one percentum is hereby imposed for State purposes for the privilege of exercising corporate franchises or other powers or privileges within this State, as follows: . . .

"(f) In the case of the merger or consolidation of two or more corporations, upon the amount of the authorized capital stock or stated capital of the new or *merged* corporation *in excess* of the greatest amount of the authorized capital stock or stated capital or both, of the several corporations so merging or consolidating, *upon which bonus has been theretofore paid under prior laws or* upon which the excise tax has theretofore been paid under the provisions of this act: *Provided*, That in case of the merger or consolidation of a *foreign* corporation which has any part of its capital actually employed within this State with a domestic corporation, such new or merged or consolidated corporations shall be entitled to credit upon any tax then due and payable for the amount of bonus or excise tax *theretofore paid* by such foreign corporation upon the amount of the capital actually employed within the State of Pennsylvania.[3]

"(g) In the case of a trust company incorporated for the purchasing, taking over, merging or consolidating with any other trust company, or purchasing, taking over or consolidating with any bank, banking company or savings institution, where such purpose is expressed in its charter, and in the case of a bank or banking company or savings institution incorporated to similarly acquire a trust company, bank, banking company or other savings institution, upon the amount of the authorized capital stock or its stated capital expressed in its new charter. or articles of incorporation, *which is in excess* of the amount of the authorized

---

[3] Italics throughout ours unless otherwise noted.

capital stock or stated capital of the corporation or corporations purchased, *merged* or acquired.

"Section 3. *Exceptions.*—*No excise tax shall be imposed or be collected* under the provisions of this act . . . (c) upon capital stock to the extent upon which a bonus has been heretofore paid under prior laws or under laws repealed by this act *or which was not liable for the payment of bonus under then existing laws.*"

## Discussion

Upon the merger of The First National Bank of Philadelphia, a national banking association, with The Pennsylvania Company for Banking and Trusts, a State bank and trust company, the latter became the surviving company and its name was changed to The First Pennsylvania Banking and Trust Company. The latter is defendant-appellant in this proceeding. By reason of the merger, the authorized capital stock of the surviving institution was increased by $5,000,000, upon which the Pennsylvania Department of State assessed domestic excise tax, after excepting therefrom $1,150,000 of capital stock which appellant had standing to its credit with the department. The balance of $3,850,000 was assessed at the rate of one-fifth of one percentum in the sum of $7,700. At no time was any bonus or excise tax paid on the $5,000,000 capital of the First National Bank.

Defendant in its brief argues:

"If a tax is levied on this capital, it is by reason of Section 2(f) of the Act, which, in the case of a merger, taxes capital '. . . in excess of the greatest amount of authorized capital stock or stated capital or both, of the several corporations so merging or consolidating, *upon which bonus has theretofore been paid under prior laws . . .*'

"It is our contention that the underlined portion is the exact equivalent of 'and upon which the bonus re-

quired by law has been theretofore paid' and it includes capital as to which no tax was due because it was exempted from the tax at the time of issue."

The Commonwealth contends that the First National's prior exemption did not continue after the merger and that the subsequent authorized issue of $5,000,000 of the surviving State bank's capital is subject to the bonus charge (now excise tax) because under section 2(f) of the act it is "capital *in excess* of the greatest amount of authorized capital stock or stated capital, or both, of the several corporations so merging or consolidating, *upon which bonus has theretofore been paid* under prior laws."

Appellant contends, as stated, that the latter clause "includes capital as to which no tax was due at its authorization or issue because it was exempt from tax at that time," and that, therefore, no bonus or excise tax is now due because "the corporate existence and identity of First National was not terminated by the merger; rather *this corporate entity with its former capital continues in existence as part of the surviving bank*." Section 1408 of the Banking Code of 1933, P. L. 624, as amended by Act of April 12, 1951, P. L. 211, 7 PS §819-1408, is cited in support of this conclusion. That section provides, inter alia:

"Section 1408. Effect of Merger or Consolidation.— . . . In the case of a merger, the surviving incorporated institution, and in the case of a consolidation, the new incorporated institution, shall be considered the same business and corporate entity as the several corporations parties to the plan of merger or consolidation, and *the corporate existence of each* of the several corporations, parties to the plan of merger or consolidation, shall be merged into *and continued* in the surviving incorporated institution in the case of a merger, and in the new incorporated institution in the case of a consolidation . . ."

We think appellant's contention was rejected in Commonwealth v. Western Maryland Railway Company, 63 Dauph. 153 (1952), and affirmed in 377 Pa. 312 (1954). There, this court, speaking through Judge Richards, held that where a foreign corporation becomes a part of a domestic corporation by reason of consolidation, the immunities it enjoyed as a foreign corporation cease with the consolidation. In that opinion it was stated (p. 157):

". . . If it enjoyed any immunity as a foreign corporation, *that immunity ceased when it became a domestic corporation.*" (Italics supplied.)

In affirming that decision, our Supreme Court, in an opinion written by Mr. Chief Justice Horace Stern, said (pp. 316-317):

"Appellant's principal contention is based on Section 3 of the Act of March 24, 1865, P. L. 49, which reads as follows: 'Upon the making and perfecting the agreement and act of consolidation, . . . the several corporations, parties thereto, shall be deemed and taken to be one corporation, . . . possessing within this commonwealth, all the rights, privileges and franchises, and subject to all the restrictions, disabilities and duties, of each of such corporations, so consolidated.' Appellant argues that Western Maryland Rail Road Company, which issued the bonds, and its successor The Western Maryland Railway Company, were immune from liability for the taxes here imposed, being *foreign* corporations with a non-resident treasurer and therefore not subject to the jurisdiction of the Commonwealth of Pennsylvania, and that the 'immunity' thus claimed passed to the present appellant in accordance with the provision of the Railway Consolidation Act above quoted. The position thus asserted is obviously untenable. Apart from the fact that the Act of 1865 refers only to 'rights, privileges and franchises,' not 'immunities,' *the Commonwealth of Pennsylvania never granted*

*any immunity or exemption of taxation* to Western Maryland Rail Road Company. That Company's freedom from taxation in Pennsylvania resulted only from the fact that it was a foreign corporation; had it domesticated itself as a Pennsylvania corporation under the Act of June 9, 1881, P. L. 89, *such freedom or 'immunity' would automatically have disappeared and it would have become subject to all the laws of the Commonwealth and to any and all taxes imposed thereby.* By the same token, when it entered into a consolidation for the formation of the present appellant, which thereupon became a domestic corporation of the State of Pennsylvania, any 'immunity' that it had enjoyed merely by reason of its having been a corporation under the laws of another State immediately vanished. . . ."

The First National Bank in the instant proceeding is practically in the same position as the defendant in the Western Maryland Railway Company case. Here, the bank voluntarily surrendered its national charter and thereupon subjected itself to Pennsylvania's jurisdiction insofar as the domestic excise tax in question is concerned. Moreover, defendant's contention is negatived by 12 U.S.C.A. §214(b), which provides in part:

"The franchise of a national banking association as a national banking association shall automatically terminate when its conversion into or its merger or consolidation with a State bank under a State charter is consummated and the resulting State bank shall be considered the same business and corporate entity as the national banking association, although as to rights, powers, and duties the resulting bank is a State bank . . ."

Appellant also relies upon Commonwealth v. Buffalo & Susquehanna Railroad Company, 207 Pa. 154 (1903), which affirmed the opinion of President Judge Weiss speaking for this court in 6 Dauph. 76. In that

case, various railroad companies had a specific *statutory* right prior to their merger, to increase their capital stock without paying any bonus after merger. The new or merged railroad corporation increased its capital stock *but within the limits of the aggregate increase previously authorized to its constituent companies.* It was held that no bonus was due upon such increase. The Supreme Court in an opinion delivered by Mr. Justice Brown stated (p. 159) :

"Whether the increase was made before or after the last merger of the companies is immaterial, for, whenever that merger took place, the merged companies, as one corporation, possessed 'all the rights, privileges and franchises theretofore vested in either of them :' Act of May 16, 1861, P. L. 702. The right and privilege of each merging company incorporated prior to the act of 1899 was to increase its capital stock to a *limited amount without paying any bonus,* and this right and privilege, by the express words of the act of 1861, became the right and privilege of all the combined companies which, though existing as a new corporation, were not a new one, created within the meaning of the act of 1899, even if the last merger did not take place until after its passage. The rights and franchises of the new corporation, composed of the merged companies, were those which had been conferred upon each of the component companies, and among them was the authority to increase its capital stock up to $150,000 per mile, conferred upon some, if not all, of them years before the passage of the acts of 1899 and 1901. . . ."

In Stradley and Krekstein,[4] Corporate Taxation and Procedure in Pennsylvania (2nd ed. 1952), section D, at page 27, it is stated:

---

[4] For a comprehensive discussion of bonus statutes relative to railroad companies, see that treatise, section 6A, pages 13, 14, 15; and section 17—Merger, Consolidation, etc., page 24 et seq.

"These cases involved special statutes affecting certain corporations only."

Our research discloses that the doctrine of Commonwealth v. Buffalo & Susquehanna Railroad Company was substantially weakened eight years later by Commonwealth v. Independence Trust Company, 233 Pa. 92 (1911). There a corporation organized in 1889, under the Act of April 29, 1874, P. L. 73, 107, with an authorized capital stock of $1,000,000, paid a bonus thereon of *one-quarter* of one percentum as fixed by the Act of 1874. It was held that such a corporation, when it increased its stock in 1909, was required to pay a bonus of *one-third* of one percentum on the increase, as provided by the Acts of May 3, 1899, P. L. 189, and February 9, 1901, P. L. 3.

In reversing the decision of this court (14 Dauph. 103) written by President Judge Kunkel, who apparently had relied upon Commonwealth v. Buffalo & Susquehanna Railroad Company, supra, Mr. Justice Elkin stated (p. 98):

". . . Here then is the clear expression of the legislative intention that the bonus shall be charged upon the amount of increase fixed by the corporators and at the rate in force when the increase is actually made. This is the law as the legislature has written it and we are bound by it. But it is argued that Com. v. R.R.Co., 207 Pa. 154, is authority for a different rule. The facts of that case differentiate it from the case at bar. It was there held that the railroad company had the authority under its charter to increase its capital stock to $150,-000 per mile without the payment of any bonus and that the act of 1901 had no application to the facts of that particular case. In the present case it is not even contended that appellee had authority under its charter to increase its capital stock without paying a bonus. *It is conceded that a bonus must be paid on the increase* and the only question is as to the rate. Clearly under

the act of 1901 the rate is one-third of one per centum and the amount is the actual increase shown by the return of the president or treasurer of the corporation after the corporate election authorizing the same."

### Section 3—Exceptions

Appellant also avers that under section 3 it is exempt from payment of the excise tax. That section provides that no excise tax shall be imposed upon capital stock "which was not liable for the payment of bonus under then existing laws."

We believe this clause is merely intended to preserve the right of a corporation, such as a national bank, which was not liable for the payment of bonus under prior laws, to continue its status of nonliability under the Act of 1953, which imposed the domestic excise tax. In any event, since section 3 deals with exceptions or exemption, it must be strictly construed against the taxpayer: Fischer v. Pittsburgh, 383 Pa. 138, 141, 142 (1955) ; McGuire v. Pittsburgh School District, 359 Pa. 602 (1948) ; Pennsylvania Bar Association Endowment v. Robins, 10 D. & C. 2d 637 (1955). See also section 58 of the Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, 46 PS §558, which provides that:

"All provisions of a law of the classes hereafter enumerated shall be strictly construed. . . .

"(5) Provisions exempting persons or property from taxation."

Furthermore, the right to exempt from taxation must be clearly established: Ogontz School Tax Exemption Case (Appeal of Abington Twp.), 361 Pa. 284 (1949). We think section 3 does not relieve appellant from the excise tax in question.

### Section 2(g)

Appellant also contends that the Commonwealth's interpretation of section 2(f) is inconsistent with sec-

tion 2(g) and that such construction renders the statute void as to bank mergers by reason of unconstitutional discrimination. In our opinion neither of these contentions is valid. Section 2(f) clearly imposes an excise tax on the capital stock of the surviving corporation, whether or not the merger involves two domestic corporations or a foreign and a domestic corporation as in this proceeding. However, as the Commonwealth points out, where the corporations are both domestic, the net tax liability is arrived at in a slightly different manner than where the merger involves a foreign corporation and a domestic corporation. In the latter case, "The second part (of the section) recognizes an equity in foreign corporations which had been denied in the earlier Act": Stradley and Krekstein, op. cit., page 24. We think section 2(g) is not involved in the case at bar. It should be noted that each of the situations described therein is separate and distinct from the one before us.

Even if we assume that the legislature has given a different tax treatment to a merger falling within the provisions of section 2(g) than it affords under section 2(f), we do not see how this would aid defendant in the proceeding. Defendant's case is controlled by the provisions of section 2(f) which it voluntarily invoked. If defendant wanted to be taxed under the provisions of section 2(g) which it argues are more favorable, it should have complied with the requirements of that section as defendant indicates in its brief it had the privilege and opportunity to do. The fact that appellant chose to follow one method of merger which it was entitled to do, does not require this court to declare other methods discriminatory or contradictory, because allegedly in conflict with the legally selected method. We are unable to find that the action of the Board of Finance and Revenue of which appellant complains was arbitrary or lacking uniformity

## Stock Issued Prior to First Bonus Act

Finally, appellant asserts that $1,000,000 of the capital stock of The First National Bank, which was chartered in 1863, was outstanding prior to the first Bonus Tax Act applicable to banks (Act of May 1, 1868, P. L. 108) and consequently that amount cannot be taxed now. Appellant cites Stradley and Krekstein, Corporate Taxation and Procedure in Pennsylvania (1940 ed.), at page 27:

"Bonus is imposed as a charge for the grant of the corporate charter, and corporations organized under the laws of this state prior to the enactment of bonus laws are not subject to bonus liability on their original authorized capital stock. (Commonwealth v. Erie and Western Transp. Co., 107 Pa. 112, 1884; Commonwealth v. Pittsburg Fire Ins. Co., 17 Dauphin 265, 1914) . . ."

Appellant concedes that this rule would be applicable in the instant case only if the capital of First National is present in the capital structure of First Pennsylvania. The Commonwealth agrees that the capital of the First National Bank was exempt from the bonus and excise tax when it was a national bank under section 5219 of United States Revised Statutes (12 U. S. C. A. §548) because the Commonwealth was imposing the bank shares tax upon that institution. It contends, however, that the first National's exemption did not survive when it ceased to exist as a national bank. We agree, for the reasons stated in Commonwealth v. Western Maryland Railway Company, supra.

The Act of July 25, 1953, P. L. 564, 72 PS §1827, supra, imposes an excise tax and not a bonus charge. We think the language of Judge Simonton of this court, which was affirmed per curiam in Commonwealth v. Erie and Western Transportation Company, 107 Pa. 112 (1884), is applicable here (p. 114):

"It must be borne in mind that this is a bonus, and not a tax. Were it the latter, there could be no question as to the power of the legislature to impose it by an Act passed subsequent to the granting of the charter. But there is a clear and substantial distinction between a bonus and a tax. The power of taxation is an incident of sovereignty, and is co-extensive with that of which it is an incident. All subjects, therefore, over which the sovereign power of the state extends, are, in its discretion, legitimate subjects of taxation; and this may be carried to an extent to which the government may choose to extend it: Cooley on Taxation 4. This power exists from necessity, it does not rest upon contract, nor does it imply a consideration in any ordinary sense of that term.

"On the other hand, the idea of a consideration is always present when we speak of a bonus. Bouvier defines it thus: 'A premium paid to a grantor or vendor, as—the bank paid a bonus to the state for its charter. A consideration given for what is received'. . ."

We have considered all the matters raised by appellant in its brief but in view of the conclusions we have reached on the pivotal points of this case, we think further discussion is not required.

### Conclusions of Law

1. The value of the capital stock of a national bank may not be used as a credit in computing domestic excise tax assessed under the Act of July 25, 1953, P. L. 564, upon the merger of the national bank into a State bank and the subsequent increase of the authorized capital stock of the latter.

2. Under such circumstances, it is immaterial that a portion of the national bank's capital stock was issued prior to the first Bonus Act of May 1, 1868, P. L. 108.

3. The settlement made by the taxing authorities did not violate any statutory or constitutional provis-

ions set forth in the appellant's specification of objections.

4. This appeal should be dismissed and judgment entered for the Commonwealth in the amount of $7,700.

### Order

And now, July 23, 1962, defendant's appeal and specification of objections are dismissed. Judgment is directed to be entered by the prothonotary in favor of the Commonwealth and against defendant in the amount of $7,700, unless exceptions be filed to this order within 30 days from the date hereof. The prothonotary shall notify the parties or their counsel of this order forthwith.