## Fossil Fuels, Inc. v. Department of Environmental Resources

*Robert P. Ging,* for Department of Environmental Resources.

*Mark W. Morava,* for appellant.

HARNISH, *Member,* June 19, 1981—This matter involves the appeal of Fossil Fuels, Inc. from DER's denial of appellant's application to transfer a mine drainage permit.

## FINDINGS OF FACT

1. Appellant is Fossil Fuels, Inc., a Pennsylvania corporation with its principal place of business at R.D. #9, Box 251, Greensburg, Pa. 15601, and telephone number of (412) 834-6622.

2. This appeal is brought to review the November 21, 1980 denial of appellant's transfer application by Thomas R. Vayansky, district mining manager, DER. The transfer application which was filed on or about July 20, 1980 was to transfer mine drainage permit 3474SM64 from Morcoal Company to Fossil Fuels, Inc. This permit covers a mining site located near the village of Chaintown in South Huntingdon Township, Westmoreland County.

3. In a letter dated August 29, 1980, Nancy Di-Meolo, geologist for the Department of Environmental Resources, Environmental Protection Bureau of Mining and Recreation, Armburst Professional Center, Greensburg, Pa., indicated that *"in order to transfer the above referenced mine drainage permit,* Morcoal Company must place the corporate seal on a notarized Release Letter" and

Fossil Fuels must submit corrected mine maps. (Emphasis supplied.)

4. Philip K. Evans and Fossil Fuels, Inc., relying on Nancy DiMeolo's letter of August 29, 1980, and subsequent telephone conversation indicating that approval would be granted to the transfer of the permit upon receipt of the requested corrected mine maps, had his consulting engineer, Penn-Laurel Association, Inc., revise the mine maps in conformity with her request.

5. By letter dated September 22, 1980 signed by Randall L. Musser, vice-president of Penn-Laurel Association, Inc., a strip mine consulting and engineering firm, Fossil Fuels, Inc. submitted to DER the corrected maps to deal with the issues outlined in the letter of August 29, 1980 from Nancy DiMeolo, DER geologist.

6. In the spring of 1980 Donald J. Zutlas a DER official had advised Mr. Evans not to submit applications and fees for license and bonds unless and until the transfer application had been approved. On or about October 1, 1980, Nancy DiMeolo, DER geologist, informed appellant by a telephone call to Philip K. Evans, appellant's president, that everything for the transfer was completed and approved, that appellant should submit its bonds and license to the DER.

7. Philip K. Evans traveled to Harrisburg on or about October 12, 1980, and submitted his bonds, certificate of deposit and license for the site. Philip Evans paid the $500 to DER for his 1980 license.

8. The requested bonds were approved by DER director, J. Anthony Ercole and Donald J. Zutlas on October 20, 1980. Growth Savings Certificate no. M33103, dated October 9, 1980, drawn on Mellon Bank, Pittsburgh, Pa., payable to Philip K. Evans

d/b/a Fossil Fuels, Inc., in the amount of $17,200 was assigned to DER. The bond was approved by Assistant Attorney General Duke Pepper.

9. Verification of the assignment of the certificate of deposit was delivered by DER to Philip K. Evans on October 22, 1980.

10. In the latter part of October, 1980, Nancy DiMeolo, DER geologist, telephoned Philip K. Evans, president of Fossil Fuels, Inc. and told him that DER had received Fossil Fuels' bond and license and that everything was fine and that "you will receive your permit very shortly, they (the bond and license) have been approved, it's just a matter of writing this particular area up."

11. The license fee in the amount of $500 was not refunded.

12. The Commonwealth of Pennsylvania continues to retain the bond money.

13. Mr. Evans acting on behalf of Fossil Fuels, Inc., in reliance on the approval of the transfer by DER officials, borrowed the amount of $10,000.

14. In further detrimental reliance appellant moved the equipment to the site, purchased additional equipment and changed his position regarding other activities and work.

15. Mr. Randall L. Musser, is the vice-president of Penn-Laurel Associates, Inc., and is a licensed surveyor and a licensed registered engineer. Mr. Musser prepared the application for transfer of the mine drainage permit in this case to Fossil Fuels, Inc. and prepared the maps and revisions requested by Nancy DiMeolo, DER geologist. Mr. Musser has been involved in the preparation of dozens of transfer applications.

16. Appellant was not informed by Nancy DiMeolo in her August 29 letter or by any other DER

official at any time that the site was inactive until the rejection letter of November 21, 1980.

17. The application for transfer of a mine drainage permit does not contain any reference or question as to whether a site is "active" or "inactive."

18. The standard procedure in preparing a mine drainage permit transfer is to submit a letter of transfer, or a letter transferring the permit to the transferee, a letter accepting the responsibility of the permit, a mine drainage permit face sheet, and an exhibit sheet for the permit, as well as exhibits 1, 2, and 3 which deal with questions about the owners of the company, their previous mining experience, their previous mining associates. The exhibits also require identification of adjacent and affected owners. The mine drainage permit transfer face sheet is a form supplied by the department.

19. Mine drainage permits have been transferred by DER for sites which have never had mining initiated on them, and other mine drainage permits have been transferred for sites upon which the coal has been removed, and the site has been backfilled, and has been lying idle for a year.

20. The mine drainage permit covers 159.3 acres, the bonded area is 10.7 acres.

21. The data, as submitted by Fossil Fuels in its application, is inadequate for the following reasons:

(a) The mine drainage map incorrectly locates Township Road 690.

(b) A variance to mine or affect within 100 feet of the road has not been obtained by the applicant. (A variance was presented to the hearing board at the time of hearing.)

(c) The slopes of the area exceed 21° and no plan for steep slope mining is included.

(d) The sediment and erosion control plans submitted with the application are not site specific.

(e) As a result of the steep slopes and required buffer zones for the coal outcrop, the proposed ponds will not fit in the area.

(f) The discharge from the ponds will empty on the township road right-of-way, and there are no existing lateral drains to handle the drainage.

(g) The treatment ponds will discharge onto the proposed township right-of-way.

(h) No typical ditch design has been provided.

(i) Ditches above the proposed highwall are not shown on the plan.

(j) The method of conveying water across the area without emptying into the pit or creating erosion and sediment problems has not been addressed.

22. The department has never approved Fossil Fuels' transfer application in writing.

23. The date contained in paragraph 21 is required to demonstrate that the site could be mined without pollution.

24. The Chaintown site mined by Morcoal was the subject of DER's bond forfeiture as upheld, following hearing, by this board at Morcoal Company v. DER, EHB Docket no. 79-189-B (issued April 30, 1981).

## DISCUSSION

This matter involves a mining site located in South Huntingdon Township, Westmoreland County near the village of Chaintown (Chaintown site) which site has recently been before us in another matter. In Morcoal Company v. DER, EHB Docket Number 79-189-B, we upheld DER's forfei-

ture of reclamation bonds for this site finding inter alia that this site had been opened but not reclaimed and that sedimentation and erosion control measures had not been implemented which resulted in a discharge of silt into the nearby Jacobs Creek.

Mining at the Chaintown site had been initiated under mine drainage permit 347SM64 which had been issued by DER to Morcoal in 1974. The present matter involves DER's denial of appellant's application to transfer the said permit to appellant. Apparently, appellant's efforts regarding the proposed transfer began in the spring of 1980. Mr. Philip K. Evans, president of appellant, testified that he initially contacted Donald J. Zutlas, chief of the licensing and bonding division, in DER's Bureau of Surface Mining Reclamation concerning the transfer. Mr. Evans further testified that he offered to submit the applications and fees for a mining license and bonding for the proposed site. However, Mr. Zutlas suggested that Mr. Evans should withhold the $500 license fee and bonds until he had been alerted that the transfer had been approved. Following the conversation with Mr. Zutlas, Mr. Evans testified that he contacted Mr. Randall L. Musser, a professional engineer with Penn-Laurel Associates, Inc., to process the transfer application with DER. During this period Mr. Evans and Mr. Musser contacted various DER personnel including Nancy D. DiMeolo, a geologist in DER's Greensburg office, regarding the said application.

On August 29, 1980 Ms. DiMeolo sent Mr. Evans a letter (App. Ex. 1) setting forth three items needed to "complete processing" transfer of the said mine drainage permit. Mr. Musser testified that the latter two of these three items were promptly ad-

dressed by submitting a revised property map to DER. (See also App. Ex. 6, Mr. Musser's cover letter dated September 22, 1980 returning the revised map to DER.)

As to the first item, bonding, Mr. Evans testified that after Ms. DiMeolo informed him that this was the only remaining item necessary to effect transfer, he filed with DER a growth savings certificate in the amount of $17,200. assigned to DER which amount covered the 10.7 acres which included haul roads and the area to be affected under the first mining permit.[1] Mr. Evans also testified that in reliance upon Ms. DiMeolo's statement, he obtained a 1980 mining license at a fee of $500; borrowed working capital in the amount of $20,000 (of which he has at this time received and spent $10,000); and purchased two bulldozers.

After he had obtained the licnese and bonding in October 1980 Mr. Evans testified that he again spoke with Ms. DiMeolo who told him, "[w]e have received your notification that the bonds and everything is fine, we hope that, you will receive your permit very shortly, they have been approved, it's just a matter of writing this particular area up."

Instead of receiving the permit, however, on November 6, 1980 Mr. Evans received another letter from Ms. DiMeolo which indicated a discrepancy between submitted plans and actual field conditions. Following this letter, Mr. Evans met with Ms. DiMeolo, as well as other DER officials including Mr. Thomas R. Vayansky, DER's district mining manager, to discuss the application but this meeting failed to produce the desired permit. In-

---

1. Mine drainage permit 3474SM64 covered about 159.3 acres.

stead on November 21, 1980, Mr. Evans received the denial letter from M. Vayansky which is the subject of the instant appeal. This letter suggests that since the site in question, is "inactive," 25 Pa. Code §99.22 does not specifically prescribe the authority to transfer the permit. The letter also submits that DER's regulations require that mine drainage applications must demonstrate that mining would be conducted in a manner which would prevent pollution to the waters of the Commonwealth. In this regard, some eleven inadequacies in the application were identified.

With this background in mind the questions presented in this matter include:

(a) Is DER estopped to deny the transfer of the said mine drainage?

(b) If DER is not estopped, is the action set forth in the presently appealed November 21, 1980 denial letter arbitrary and capricious, contrary to law or unconstitutional?

With regard to the first issue, DER argues that it cannot be estopped by the action of one of its employes and DER further challenges Mr. Evans' memory of Ms. DiMeolo's statements. DER's construction of the case law is too broad. Clearly, the Commonwealth can be subject to estoppel in pais. In Dept. of Public Welfare v. UEC, Inc., 483 Pa. 503, 397 A. 2d 779 (1979), the Pennsylvania Supreme Court held that the Commonwealth was estopped from asserting a statute of limitations by reason of the statements of various Commonwealth officials and the detrimental reliance thereupon by employes of UEC, Inc. See also Com. v. Barnes & Tucker Co., 455 Pa. 392, 319 A. 2d 871 (1974), where the Pennsylvania Supreme Court found on the basis of the facts *in that case* that estoppel did

not lie agianst DER: Com. v. Western Maryland Railway Co., 377 Pa. 312, 105 A. 2d 336 (1954), and the other cases cited in 483 Pa. 516, fn.6, 397 A. 2d 785, fn.6, of UEC, Inc., supra, carve out a narrow exception to the application of estoppel against the Commonwealth. These cases state that estoppel *by laches* cannot be applied against the government to prevent it from exercising some governmental function. Thus, mistaken indulgence by, or errors of a Commonwealth employe create no prescriptive rights in a regulatee.

In the present case some, but not all, of the elements of estoppel in pais are present. It is clear that Ms. DiMeolo made essentially the statements to which Mr. Evans testified. The Commonwealth's efforts to impeach Mr. Evans' memory and/or credibility cannot overcome the added strength given his testimony by DER's failure to call Ms. DiMeolo (who was present at the hearing) to rebut his testimony. Mr. Evans' good faith reliance upon Ms. DiMeolo's statements is also uncontraverted.

The missing element to establish an estoppel is that there is no evidence that Ms. DiMeolo had the authority to issue the requested permit or to make DER's final determination in the matter. One always relies upon oral representations of public officials at his peril and when the public official is a staff person rather than, as in UEC, Inc., supra, the Secretary of a Department and his general counsel, the peril is grave indeed. Thus, we hold that an estoppel has not been made out on the facts of this case against DER.[2]

_____

2. We have also determiend that DER did not issue the requested permit and then attempt to revoke it and thus, we are not prepared to shift the burden of proof on the completion or incompleteness of the application to DER.

Having decided that there has been no estoppel, the question becomes whether the challenged action is arbitrary or capricious, contrary to law or unconstitutional. In this regard, the starting point will be 25 Pa. Code §99.22 which governs transfers of mine drainage permits. Section 99.22 provides that:

"§99.22. Transfer of permits. (a) Permits may be reissued in a new name provided that no change of ownership is involved.

"(b) If a person desires to assume the operation of an active mine and does not wish to submit an entirely new application, the Department will accept an application which incorporates the original plan of drainage. In such a case the applicant shall expressly agree to abide by all permit conditions, assume the responsibility for any violations which may occur on the area previously affected and shall furnish the Department with complete information as to the identity of the applicant, a property map in triplicate showing the extent to which the mining has been completed under the existing permit and such additional information as will enable the Department to determine that the applicant is able to operate the mine in such a manner as to prevent pollution to waters of the Commonwealth."

DER argues that the said mine drainage permit for the Chaintown site cannot be transferred because this site is inactive. It is clear, through the testimony of Mr. Evans, that no mining has been conducted on this site since 1977 and that the site has not been reclaimed. Moreover, we take official notice of the Morcoal, supra, adjudication in which Morcoal's bonds on this site were forfeited.

On the other hand, there is no evidence that DER has voided Morcoal's mine drainage permit and Mr.

Musser testified that in at least two other situations DER permitted the transfer of unvoided mine drainage permits on sites where mining had not been conducted for up to one year prior to the transfer. This is strong evidence that DER considered the determination of whether a mine is active in the context of section 99.22 to be within its discretion rather than a matter of law.

The absence of any definition of "active mine" in the statute or regulations fortifies this position.[3] Another reason for so construing that the determination of whether a mine is active is within DER's discretion is the public policy argument that DER should be given great latitude in allowing the transfer of permits so that responsible operators could be encouraged, by the lure of the lower bonding rates available under old permits, to correct violations on mining sites abandoned by less competent operators. Indeed, in the instant matter, appellant is seeking the opportunity to correct the problems created by Morcoal at the Chaintown site.

Thirdly, applying the canons of statutory construction to Chapter 99 of DER's regulations also supports the view that DER has discretion to determine whether a site is active for purposes of section 99.22. Looking at Chapter 99 as a whole it appears that the term "active mine" in section 99.22 relates back to section 99.21 which states that permits become null and void within two years of issuance if mining is not commenced within this period. Clearly, a void permit cannot be transferred and the "active mine" phrase in §99.22 merely re-

---

3. "Active operation" is defined in the Surface Mining Conservation and Reclamation Act of November 30, 1971, P.L. 554, 52 P.S. §1396.3, but this definition relates to noncoal operations only.

flects that permits which become void by operation of section 99.21 or which are voided by DER cannot be transferred. Similarly, comparing § 99.22 to § 99.23 it is seen that in the latter section the name of a permittee may be changed without a transfer application, map and/or additional information (all required under section 99.22) so long as the mine is in operation. This clearly implies that the phrase "active mine" in section 99.22 comprehends something less than the phrase "mine in operation" in section 99.23, since the safeguards in section 99.22 greatly exceed those set forth in § 99.23.

Since the determination of whether a mine is active under section 99.22 is within DER's discretion we may review DER's exercise of this discretion: Rochez Brothers Inc. v. DER, 18 Pa. Commonwealth Ct. 137, 334 A. 2d 790 (1975). Given the fact that the Chaintown site was in litigation during the time the present transfer application was being processed and that members of DER's legal and technical staffs participated in this litigation we find it incredible that DER now asserts that Mr. Evans owed DER information concerning the activity of his site even though such information was not requested by DER. Clearly, DER as a corporate entity must be charged with knowledge of status of the Chaintown site and just as clearly, at least someone in DER must have concluded that this site was an "active mine" as that term is used in section 99.22. While, as stated above, such a tacit determination was not final so as to constitute the transferral of the permit or so as to create an estoppel, it, nevertheless, must be weighed by this board in reviewing DER's exercise of discretion. Moreover, the present record indicates that DER, in other cases, has transferred permits on sites which have

been literally inactive for over a year. Since DER came forth with no testimony to distinguish the instant application from transfer applications approved in other, seemingly similar, situations, we must conclude that DER had no reason for treating the instant appellant differently from the other applicants. Unreasoned classification is the very definition of an arbitrary and capricious action. Thus, in the circumstances of this case we find that it was an abuse of DER's discretion to determine the Morcoal site to be inactive.

This does not conclude the matter, however. Section 99.22(b) as quoted above, allows DER to request "such additional information as will enable the Department to determine that the applicant is able to operate the mine in such a manner as to prevent pollution to the waters of this Commonwealth." The questions 1 through 11 in DER's denial letter of November 21 represent an attempt to solicit this information and appellant's own expert witness, Mr. Musser, agreed that each of the 11 items was reasonable and that only the variance item for the township road T-690 has yet to be addressed by appellant. It would, therefore, seem proper for DER to require appellant to submit the information requested regarding the other items prior to the issuing of the requested transfer permit and the application is remanded to DER for this purpose. Such a remand, while protecting the environment, and allowing DER to comply with the Pa. Const., Art. I, §27; 25 Pa. Code §§99.11 and 99.22, and Harman Coal Company v. DER, 34 Pa. Commonwealth Ct. 610, 384 A. 2d 289 (1978), should not unduly inconvenience appellant whose expert estimated that it would take as little as two weeks to supply the requested information. This remand

should also cure any constitutional defects in DER's procedure in this matter and comply with the apparent requirement in section 5(c) of the Surface Mining Conservation and Reclamation Act, 52 P.S. §1396.4(C), as amended October 10, 1980, for DER to afford appellant a reasonable opportunity to amend its application.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the parties and the subject matter.

2. The Chaintown site as described above is an active mine as that term is used in 25 Pa. Code §99.22; in the circumstances of this case, DER was arbitrary and capricious in determining that it was inactive.

3. DER was not estopped from denying appellant's transfer application because of the representations of a DER employe who was not demonstrated to have the authority to issue the permit.

4. DER has authority under 25 Pa. Code §§99.11 and 99.22, and Article I, §27 of the Pennsylvania Constitution to require a showing from an applicant for a transfer permit that it can conduct mining so as to prevent pollution to the waters of the Commonwealth.

5. DER's request for additional information in the instant matter was neither arbitrary nor capricious nor contrary to law.

## ORDER

And now, June 19, 1981, appellant's transfer application, as described above, is remanded to DER for a review of such information as appellant may submit concerning items 1 through 11 in the letter

of November 21, 1980. DER's review of this material shall be completed within 30 calendar days following its receipt of complete information from appellant or such additional period as may be granted by written approval of appellant or this board. The board retains jurisdiction.